**[J-72-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 11 WAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered July 21, |
| | : | 2023, at No. 747 WDA 2022, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Court of Common Pleas of |
| | : | Butler County entered May 26, |
| BRENDAN ALEXANDER LINTON, | : | 2022, at No. CP-10-CR-0001351- |
| | : | 2021. |
| Appellant | : | |
| | : | ARGUED: October 10, 2024 |


**<u>OPINION</u>**


**JUSTICE DOUGHERTY**                                                 **DECIDED: JUNE 17, 2025**

The Vehicle Code[1] governs the safe, efficient, and uniform travel of all manner of

vehicles on the Commonwealth's public roads.  At issue in this case is Section 3364(b)(2)

of the Code, which provides that pedalcycle operators (more commonly known as

bicyclists) "shall use reasonable efforts so as not to impede the normal and reasonable

movement of traffic." 75 Pa.C.S. §3364(b)(2).  The precise question we agreed to resolve

is whether this statute requires cyclists to "leav[e] the roadway whenever faster moving

traffic approaches or backs up[.]"  *Commonwealth v. Linton*, 315 A.3d 1224 (Pa. 2024)

(*per curiam*).  Appellant argues there is no situation in which it would be reasonable to

expect cyclists to leave the road for faster moving traffic, whereas the lower courts took

the exact opposite view, and the Commonwealth largely agrees.  We reject these rigid

---

[1] *See* 75 Pa.C.S. §§101 – 9805.

interpretations. As explained below, we conclude the statute instead calls for a fact-bound assessment of reasonableness, taking all relevant considerations into account, and that there may be factual circumstances under which a factfinder could properly determine the "reasonable efforts" a pedalcycle operator must exert so as not to impede the normal and reasonable movement of traffic include temporarily leaving the roadway. Accordingly, we reverse and remand to the Superior Court for further proceedings consistent with this Opinion.

Before we set forth the facts of this case, we find it helpful to unpack some of the relevant terminology. "Vehicles" are broadly defined under the Code as "[e]very device in, upon or by which any person or property is or may be transported or drawn upon a highway, except devices used exclusively upon rails or tracks." 75 Pa.C.S. §102.[2] One type of vehicle is a "motor vehicle." A motor vehicle is defined as a "vehicle which is self-propelled except an electric personal assistive mobility device or a vehicle which is propelled solely by human power." *Id.* Vehicles that are propelled predominately by human power, like bicycles, are known as "pedalcycles." The Code defines a pedalcycle as a "vehicle propelled solely by human-powered pedals or a pedalcycle with electric assist. The term does not mean a three-wheeled human-powered pedal-driven vehicle with a main driving wheel 20 inches in diameter or under and primarily designed for children six years of age or younger." *Id.*[3]

---

[2] However, "[t]he term does not include a self-propelled wheelchair or an electrical mobility device operated by and designed for the exclusive use of a person with a mobility-related disability." 75 Pa.C.S. §102.

[3] A "pedalcycle with electric assist" is a "vehicle weighing not more than 100 pounds with two or three wheels more than 11 inches in diameter, manufactured or assembled with an electric motor system rated at not more than 750 watts and equipped with operable pedals and capable of a speed not more than 20 miles per hour on a level surface when powered by the motor source only. The term does not include a device specifically designed for use by persons with disabilities." 75 Pa.C.S. §102. A pedalcycle with electric (continued…)

The Code also describes the different types of public roads that exist throughout the Commonwealth. Most roads fall under the general definition of a "highway." A highway includes "[t]he entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel. The term includes a roadway open to the use of the public for vehicular travel on grounds of a college or university or public or private school or public or historical park." *Id.* One specific type of highway is a "through highway," which is "[a] highway or portion of a highway on which vehicular traffic is given preferential right-of-way, and at the entrances to which vehicular traffic from intersecting highways is required by law to yield the right-of-way to vehicles on the through highway in obedience to a stop sign, yield sign or other official traffic-control device when the signs or devices are erected as provided in this title." *Id.*[4] A "roadway," in turn, is "[t]hat portion of a highway improved, designed

---

assist is distinct from a "motorized pedalcycle," which is a "motor-driven cycle equipped with operable pedals, a motor rated no more than 1.5 brake horsepower, a cylinder capacity not exceeding 50 cubic centimeters, an automatic transmission, and a maximum design speed of no more than 25 miles per hour or an electric motor-driven cycle equipped with operable pedals and an automatic transmission powered by an electric battery or battery pack-powered electric motor with a maximum design speed of no more than 25 miles per hour." *Id.*

[4] Other specific types of highways include "limited access highways," which are "highway[s] in respect to which owners or occupants of abutting lands and other persons have no legal right of access except at points and in the manner determined by the authority having jurisdiction over the highway"; "freeways," which are "limited access highway[s] to which the only means of ingress and egress is by interchange ramps"; "interstate highways," which are "freeway[s] on the Dwight D. Eisenhower System of Interstate and Defense Highways"; "state designated highways," which are "highway[s] or bridge[s] on the system of highways and bridges over which [PennDOT] has assumed or has been legislatively given jurisdiction"; and the "Pennsylvania Turnpike," which is "[t]he highway system owned and operated by the Pennsylvania Turnpike Commission." 75 Pa.C.S. §102. In addition to highways, which are publicly maintained, there are also "trafficways," which are not. The Code defines a trafficway as "the entire width between property lines or other boundary lines of every way or place of which any part is open to the public for purposes of vehicular travel as a matter of right or custom." *Id.*

or ordinarily used for vehicular travel, exclusive of the sidewalk, berm or shoulder even though such sidewalk, berm or shoulder is used by pedalcycles. In the event a highway includes two or more separate roadways the term 'roadway' refers to each roadway separately but not to all such roadways collectively." *Id.* "A roadway which is divided into two or more clearly marked lanes for vehicular traffic" is a "laned roadway." *Id.*

Finally, the Code provides definitions for two other terms relevant to this appeal. "Traffic" is defined as "[p]edestrians, ridden or herded animals, vehicles, streetcars and other conveyances, whether singly or together, using any highway for purposes of travel." *Id.* And the word "shall" is statutorily defined for purposes of the Code as "[i]ndicat[ing] that an action is required or prohibited." *Id.*

Having explicated the pertinent legal nomenclature, we now turn to the facts of this case.[5] In the morning on July 31, 2021, appellant Brendan Linton was riding his bicycle — which, per the language of the Code, we will refer to as a pedalcycle — on Evans City Road (also known as Route 68) in Butler Township. The stretch of Evans City Road in question is a heavily trafficked, state designated through highway with one lane of travel going westbound and one lane going eastbound. The area appears to be a business district, and there are multiple intersections with traffic-control signals.[6] The maximum speed limit varies from 45 miles per hour (mph) to 55 mph. There is no minimum speed limit posted.[7] In the center of the highway is a solid double yellow line. A solid white line

---

[5] These facts are derived from appellant's summary trial held on May 26, 2022, including our independent review of dashcam video footage entered into evidence at trial.

[6] *See* 75 Pa.C.S. §102 (defining "business district" as the "territory contiguous to and including a highway when within any 600 feet along the highway there are buildings in use for business or industrial purposes, including but not limited to hotels, banks, or office buildings, railroad stations and public buildings which occupy at least 300 feet of frontage on one side or 300 feet collectively on both sides of the highway").

[7] *See* 75 Pa.C.S. §3364(c) ("At any other time when [PennDOT] or local authorities under their respective jurisdictions determine on the basis of an engineering and traffic (continued…)

(commonly referred to as a fog line) borders the outer edge of each lane. Adjacent to the westbound roadway is a paved berm or shoulder wide enough to fit a motor vehicle. Pedalcycles are permitted on the highway or on the berm.[8] At various locations along the westbound berm there are repaved potholes, loose gravel, rumble strips, and sewer grates.

Pennsylvania State Trooper Joshua Osche was on patrol, sitting stationary in a Sheetz parking lot located at an intersection, when he observed appellant operating his pedalcycle westbound on Evans City Road. Trooper Osche was "familiar with a few traffic complaints of slow moving [pedal]cycle[s] that vehicles could not get around in this area on prior occasions." N.T. Summary Trial, 5/26/22, at 6. He activated his vehicle's dashcam and pulled onto Evans City Road, going westbound. There were at least ten motor vehicles between appellant and Trooper Osche. Within a minute and a half, all but one of them successfully passed appellant or turned off the highway. Less than thirty seconds later, the last remaining vehicle successfully passed appellant, leaving Trooper Osche directly behind him.

Trooper Osche followed appellant for approximately a minute and fifteen seconds before he first attempted to pass him on the left as they approached an intersection. The speed limit up to that point was 45 mph, with westbound traffic having slowed to as low as 12 mph for a brief period. Due to oncoming traffic, Trooper Osche did not complete the pass. Less than forty-five seconds later, he attempted to pass appellant a second

---

investigation that slow speeds on any highway or part of a highway impede the normal and reasonable movement of traffic, [PennDOT] or such local authority may determine and declare a minimum speed limit below which no person shall drive a vehicle except when necessary for safe operation or in compliance with law. The minimum limit shall be effective when posted upon appropriate fixed or variable signs.").

[8] *See* 75 Pa.C.S. §3505(a) (permitting "a pedalcycle upon a highway"); *id.* at (b) (same with respect to "the shoulder of a highway").

time before again aborting due to oncoming traffic.[9]  Appellant was traveling at 19 mph at that time, in a 55-mph zone.  Trooper Osche initiated a traffic stop less than fifty seconds later.  The Trooper asked appellant if he had identification.  Appellant initially responded that he was not required to provide his identification and then stated he did not have it with him.  Nonetheless, Trooper Osche was able to retrieve appellant's information and confirm his identity.[10]  He informed appellant a summons would be mailed to him.  Appellant replied, "keep em' coming."  N.T. Summary Trial, 5/26/22, at 10.

All told, the entire encounter — from the moment Trooper Osche spotted appellant on Evans City Road until he concluded the traffic stop — lasted just over eight minutes.  Trooper Osche was in traffic behind appellant for less than half that time, and directly behind him for less than two minutes total before he initiated the stop.

Appellant was charged with disorderly conduct (creating a hazardous or physically offensive condition), *see* 18 Pa.C.S. §5503(a)(4), violating the duties of an operator or pedestrian upon investigation by police, *see* 75 Pa.C.S. §6308(a),[11] and one count of

---

[9] Between Trooper Osche's two attempted passes, the following items appeared in the westbound shoulder within seconds of one another, in this order: a "Keep Off Shoulder" sign; a moving utility truck with its overhead lights activated; a utility worker walking in front of the truck; and a pedestrian crossing perpendicular through the shoulder into a commercial driveway.  *See* Dashcam Video, Commonwealth's Exhibit 1, at 3:02-3:50.  A "Watch for Turns" sign appeared immediately after Trooper Osche attempted the second pass.  *See id.* at 3:52-4:03.

[10] Trooper Osche specifically "recalled the name Brendan Linton" was associated with "previous encounters of persons exhibiting the same conduct in this area[.]"  N.T. Summary Trial, 5/26/22, at 10.

[11] This statute broadly applies to the "operator of any vehicle or any pedestrian reasonably believed to have violated any provision of this title" and requires that such person "shall stop upon request or signal of any police officer and shall, upon request, exhibit a registration card, driver's license and information relating to financial responsibility, or other means of identification if a pedestrian or driver of a pedalcycle, and shall write their name in the presence of the police officer if so required for the purpose of establishing identity."  75 Pa.C.S. §6308(a).  A similar statute applicable exclusively to motor vehicle (continued…)

violating 75 Pa.C.S. §3364(b)(2). He proceeded to a summary bench trial. Trooper Osche testified to the above facts and the Commonwealth played the eight-minute dashcam video in support. For his part, appellant testified that he rides his pedalcycle almost daily as a form of exercise to treat a chronic medical condition. He characterized the shoulder on Evans City Road as "particularly hazardous" and emphasized multiple motor vehicles were able to pass him without him needing to pull off the roadway. N.T. Summary Trial, 5/26/22, at 25. When asked whether he acknowledged or took "any efforts to alleviate any motor vehicle traffic behind" him, appellant responded: "I have no legal obligation to do so." *Id.* at 34-35.

The trial court found appellant guilty of violating 75 Pa.C.S. §3364(b)(2) and not guilty of the remaining offenses.[12] As the court later explained in its Rule 1925(a) Opinion, appellant's operation of his pedalcycle on Evans City Road "[c]learly" impeded the normal and reasonable movement of traffic by temporarily slowing it to speeds as low as 12 mph in a 45-mph zone. Trial Court Op., 8/25/22, at 2. In the court's view, appellant "should have moved to the berm area to the right of the white fog line when motor vehicles were behind him." *Id.* at 3. His failure to do so, the court opined, placed others on and near

---

operators is found at 75 Pa.C.S. §1511(a) (carrying and exhibiting driver's license on demand).

[12] During trial, the court permitted the Commonwealth to amend the charges to include a count under 75 Pa.C.S. §3364(b)(1), in addition to (b)(2). *See* N.T. Summary Trial, 5/26/22, at 14-15. However, after appellant's counsel argued (b)(1) applies to vehicles other than pedalcycles, and that pedalcycles are exclusively addressed under (b)(2), the court seemingly agreed and acquitted appellant under (b)(1). *See id.* at 41-42.

As for appellant's acquittal under 75 Pa.C.S. §6308(a), the court explained that even though appellant did not produce his driver's license upon request by Trooper Osche, the Commonwealth failed to prove the Trooper gave appellant an opportunity to present other means of identification or "to write his name in the presence of the police officer." *Id.* at 40. *See* 75 Pa.C.S. §6308(a) (permitting pedestrians and pedalcycle operators to exhibit "other means of identification" aside from a driver's license, including "writ[ing] their name in the presence of the police officer if so required for the purpose of establishing identity").

the highway "in grave danger." *Id.* Accordingly, the court found appellant guilty of a summary offense under Section 3364(b)(2) and imposed a $25 fine. *See* 75 Pa.C.S. §6502(a) ("Every person convicted of a summary offense for a violation of any of the provisions of this title for which another penalty is not provided shall be sentenced to pay a fine of $25.").

The Superior Court affirmed appellant's judgment of sentence on appeal. *See Commonwealth v. Linton*, 303 A.3d 767 (Pa. Super. 2023) (unpublished memorandum). In rejecting his challenge to the sufficiency of the evidence, the panel explained that, to prove a violation of Section 3364(b)(2), the Commonwealth was required to prove either that appellant did not operate his pedalcycle at a safe and reasonable speed for a pedalcycle, or that he failed to use reasonable efforts so as not to impede the normal and reasonable movement of traffic. The panel reasoned the Commonwealth satisfied the latter criteria by establishing appellant "was impeding traffic on a busy two-lane roadway by traveling in the traffic lane at a speed of [12] mph in a 45-mph zone and [19] mph in a 55-mph zone." *Id.* Had appellant simply "us[ed] the wide berm next to him[,]" the panel continued, it would have alleviated the traffic buildup caused by his pedalcycle's slower speeds. *Id.* Moreover, although the panel acknowledged there were some obstructions on the berm, it faulted appellant for "fail[ing] to demonstrate why he could not simply go around the single vehicle, the single pedestrian, and the rumble strips, and return to the berm over the remainder of the lengthy stretch of the roadway on which he was travelling." *Id.*[13]

---

[13] The Superior Court, citing a supposed concession appellant made while testifying, did not consider the "Keep off Shoulder" sign in its analysis, asserting "this sign was far off in the distance ahead on the roadway and had no bearing on the section of roadway at issue in this litigation." *Linton*, 303 A.3d at 767 n.2, *citing* N.T. Summary Trial, 5/26/22, at 34. This position is not supported by the record. *See* N.T. Summary Trial, 5/26/22, at 20 (Trooper Osche, upon being shown the dashcam video, "agree[ing] there's a sign on the (continued…)

We granted discretionary review to address the following issue as framed by appellant:

> Section 3364(b)(2) of the Vehicle Code requires individuals operating pedalcycles to "use reasonable efforts so as not to impede the normal and reasonable movement of traffic." Does a proper construction of the Vehicle Code inform the meaning of reasonable efforts and foreclose any interpretation that it includes leaving the roadway whenever faster moving traffic approaches or backs up, which would effectively prohibit operation of pedalcycles on most roadways and/or endanger those operating them throughout the Commonwealth?

*Linton*, 315 A.3d at 1224 (*per curiam*). As this issue "raises a pure question of law involving statutory interpretation, our scope of review is plenary and our standard of review is *de novo*." *Commonwealth v. Gamby*, 283 A.3d 298, 304 (Pa. 2022). "In deciding matters of statutory interpretation, we apply the guidelines set forth in the Statutory Construction Act," *see* 1 Pa.C.S. §§1501-1991, "which provides that the object of statutory interpretation is 'to ascertain and effectuate the intention of the General Assembly.'" *Commonwealth v. Crosby*, 329 A.3d 1141, 1149 (Pa. 2025) (footnote omitted), *quoting* 1 Pa.C.S. § 1921. "Generally, the plain language of the statute provides the best indication of legislative intent." *Id.* (internal quotations and citation omitted). "When the statutory language is ambiguous, however, we may ascertain the General Assembly's intent by considering the factors set forth in Section 1921(c) of the Statutory Construction Act, 1 Pa.C.S. §1921(c), and other rules of statutory construction." *Crawford v. Commonwealth*, 326 A.3d 850, 885 (Pa. 2024).

Appellant argues Section 3364(b)(2) is ambiguous insofar as it is unclear whether the "reasonable efforts" a pedalcycle operator must employ to avoid impeding the normal

---

road that says keep off shoulder"); Dashcam Video, Commonwealth's Exhibit 1, at 3:17 (clearly showing the sign). Nor is the lower court's description of "a single pedestrian" in the shoulder accurate. *Linton*, 303 A.3d at 767. *See* N.T. Summary Trial, 5/26/22, at 26 (describing two pedestrians); Dashcam Video, Commonwealth's Exhibit 1, at 3:24-3:31 (showing first pedestrian); *id.* at 3:31-3:45 (showing second pedestrian).

and reasonable movement of traffic includes leaving the roadway. *See* Appellant's Brief at 19 (explaining the phrase "reasonable efforts" could be read "expansively as requiring" pedalcycles to "pull[ ] off the roadway and onto the berm or shoulder" or "narrowly" as "requiring a balancing of all legitimate interests involved"). He advocates a narrow interpretation of the phrase, one that forecloses requiring a pedalcyclist to move off the roadway under any circumstance. According to appellant, a narrow construction is warranted since Section 3364(b)(2) "is part of a series of pedalcycle-specific provisions that treat pedalcycles differently, giving operators . . . additional rights on the road as compared to other vehicles[.]" *Id.* at 27; *see id.* at 23-25 (discussing 75 Pa.C.S. §3301(c)(2)(ii) (permitting pedalcycles to ride anywhere in lane on single-lane roadway), §3303(a)(3) (requiring motor vehicles that pass a pedalcycle on the left to provide not less than four feet of space and to proceed at a careful and prudent reduced speed), and §3307(b.1) (permitting drivers to pass pedalcycles on the left even in marked no-passing zones)). Appellant continues that Section 3364 itself underscores this point. He notes subsection (b)(1), which pertains to "vehicles," contains an explicit requirement "to pull off the roadway[,]" whereas subsection (b)(2), which applies only to pedalcycles, "does not do that, instead directing pedalcyclists to use 'reasonable efforts' so as to avoid impeding traffic." *Id.* at 28 (emphasis omitted). As appellant sees it, "Section 3364(b)(1)'s keep up or pull over requirement means keep up or pull over, so reasonable efforts must mean something else." *Id.* at 29.

To the extent the statute's meaning is not discernible even when read in context with the surrounding statute and other provisions in the Code relating to pedalcycles, appellant points us to several extrinsic aids he claims support his view that the General Assembly did not intend for subsection (b)(2) to require pedalcyclists to pull off the road. Specifically, he argues history, policy, the statute's legislative history, and existing

administrative guidance — namely, PennDOT's Bicycle Driver's Manual — all demonstrate "that pedalcyclists have a right to operate pedalcycles on the roadway," which "counsels in favor of an interpretation that 'reasonable efforts' does not include a requirement to pull over whenever other traffic approaches." *Id.* at 45. Lastly, appellant submits the rule of lenity counsels for construing Section 3364(b)(2) narrowly and in his favor.[14]

The Commonwealth, in contrast, argues Section 3364(b)(2), including the phrase "reasonable efforts," is unambiguous and describes an affirmative action the pedalcyclist must undertake. In the Commonwealth's view, if a "pedalcycle is traveling at such a slow speed that it is impeding traffic, the only practical action for the pedalcycle would be to move off the roadway until traffic subsides." Commonwealth's Brief at 5. The Commonwealth contests appellant's claim that viewing the statute in its full context and alongside other provisions of the Code supports a contrary interpretation. With respect to Section 3364, for example, the Commonwealth notes subsections (b)(1) and (b)(2) "both fall under the subheading entitled 'Slow moving vehicle to drive off roadway.'" *Id.* at 16; *see also id.* at 36 (emphasizing that "'[a] pedalcycle may be operated on the shoulder of a highway'"), *quoting* 75 Pa.C.S. §3505(b). As for appellant's reliance on other parts of the Code relating to pedalcycles, the Commonwealth argues those statutes support its view "that pedalcycles cannot always use the roadways unabated." *Id.* at 24. It contends the same is true of PennDOT's Bicycle Driver's Manual, which "does not condone a reading of the rules of the road with no obligation whatsoever for a pedalcycle

---

[14] *Amici curiae*, BikePGH and the League of American Bicyclists, which advocate for the rights and safety of pedalcyclists, filed a joint brief in support of appellant. *Amici* highlight PennDOT's Bicycle Driver's Manual's translation of the Vehicle Code into plain language, which they argue supports appellant's interpretation of Section 3364(b)(2). *Amici* caution that if the law is interpreted to require pedalcyclists to move over for motor vehicles it would contradict PennDOT's current guidance, frustrate *amici*'s public education efforts, and jeopardize the safety of pedalcyclists and others.

to move aside in regard for other traffic." *Id.* at 28. Finally, the Commonwealth asserts "the strictest means of statutory construction are not called for, given the statute does not carry a penalty that would restrict [appellant]'s liberty." *Id.* at 31.

We begin with the text of Section 3364, a statute this Court has not had the opportunity to examine before today. The statute, which is titled "Minimum speed regulation," provides in relevant part:

> **(a) Impeding movement of traffic prohibited.--** Except when reduced speed is necessary for safe operation or in compliance with law, no person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic.
>
> **(b) Slow moving vehicle to drive off roadway.--**
>
> > (1) Except when reduced speed is necessary for safe operation or in compliance with law, whenever any person drives a vehicle upon a roadway having width for not more than one lane of traffic in each direction at less than the maximum posted speed and at such a slow speed as to impede the normal and reasonable movement of traffic, the driver shall, at the first opportunity when and where it is reasonable and safe to do so and after giving appropriate signal, drive completely off the roadway and onto the berm or shoulder of the highway. The driver may return to the roadway after giving appropriate signal only when the movement can be made in safety and so as not to impede the normal and reasonable movement of traffic.
> >
> > (2) A pedalcycle may be operated at a safe and reasonable speed appropriate for the pedalcycle. A pedalcycle operator shall use reasonable efforts so as not to impede the normal and reasonable movement of traffic.

75 Pa.C.S. §3364.

As can be seen, subsection (a), which we will refer to as the "slow speed impeding traffic (motor vehicle)" provision, prohibits motor vehicles from driving at such a slow speed as to impede the normal and reasonable movement of traffic, absent a legal or safety reason. Meanwhile, subsection (b)(1), which we will call the "slow speed impeding

traffic (failure to drive off roadway)" provision, applies more broadly to all vehicles, but only on roadways with one lane of traffic in each direction. It requires any vehicle traveling on such a roadway that is impeding the normal and reasonable movement of traffic to drive completely off the roadway and onto the berm or shoulder of the highway once it is reasonable and safe to do so. Finally, subsection (b)(2), which we will term the "slow speed impeding traffic (pedalcycle)" provision, applies on all types of roads, but only to pedalcycles.

Our focus here is on the pedalcycle-specific provision found in subsection (b)(2). The first sentence of this provision provides that "[a] pedalcycle may be operated at a safe and reasonable speed appropriate for the pedalcycle." 75 Pa.C.S. §3364(b)(2). Plainly, this sentence grants pedalcycle operators a right — that is, it generally permits them to operate "at a safe and reasonable speed appropriate for the pedalcycle" on any highway, regardless of speed limit. However, the provision's second sentence limits the right granted by the first by imposing a duty on the pedalcycle operator. It mandates that "[a] pedalcycle operator shall use reasonable efforts so as not to impede the normal and reasonable movement of traffic." *Id.* The specific question we are asked to resolve in this appeal is whether the duty this sentence imposes on pedalcycle operators includes leaving the roadway for faster moving traffic. We conclude it does, but only under certain conditions.

Initially, we agree with the Commonwealth that subsection (b)(2), standing alone, appears unambiguous. In fact, there is no real dispute over any of subsection (b)(2)'s component parts. The first sentence is not at issue at all. As for the second sentence, the parties agree its words should be construed according to their common and approved usage and the rules of grammar, *see* 1 Pa.C.S. §1903(a), and both favorably cite the same dictionary definitions. *See* Appellant's Brief at 20-21; Commonwealth's Brief at 13-

14.  We follow suit.  *See Commonwealth v. Chisebwe*, 310 A.3d 262, 269 (Pa. 2024) ("The common and approved meaning of a word or phrase is appropriately gleaned from dictionary definitions.").

"Reasonable efforts" is a noun phrase in which "reasonable" acts as an adjective modifying the noun "efforts."  The noun "efforts" denotes a "conscious exertion of power," "a serious attempt," or "something produced by exertion or trying."  *Efforts*, Merriam-Webster.com, https://www.Merriam-Webster.com/dictionary/efforts (last visited June 12, 2025).  Something is commonly understood to be "reasonable" when it is "in accordance with reason," "fair," "not extreme or excessive," or based on "sound judgment."  *Id.* ("reasonable").  Also relevant here, to "impede" something is "to interfere with or slow the progress of" it.  *Id.* ("impede").  And, as previously noted, the Vehicle Code defines the word "shall" as "[i]ndicat[ing] that an action is required or prohibited[,]" and "traffic" as all "[p]edestrians, ridden or herded animals, vehicles, streetcars and other conveyances, whether singly or together, using any highway for purposes of travel."  75 Pa.C.S. §102.  Taken together, then, subsection (b)(2) is best understood as imposing an affirmative duty on pedalcycle operators to make a serious, fair attempt to avoid interfering with or slowing the progress of other traffic traveling on the highway beyond what is normal and reasonable for such traffic.

However, we also agree with appellant that, even if subsection (b)(2) appears unambiguous on its own, its plain terms do not resolve the issue before us.  Indeed, the ambiguity sharpens when we zoom out one frame and consider (b)(2) alongside (b)(1).  Both subsections are aimed at preventing the impeding of traffic, but only subsection (b)(1) contains an explicit directive to "drive completely off the roadway and onto the berm or shoulder of the highway."  75 Pa.C.S. §3364(b)(1).  As appellant plausibly argues, this could suggest the General Assembly "did not intend the requirement be included in"

subsection (b)(2). Appellant's Brief at 29, *citing Commonwealth v. Bigelow*, 399 A.2d 392, 395 (Pa. 1979) ("Where a section of a statute contains a given provision, the omission of such a provision from a similar (section) is significant to show a different intention existed."). We thus agree the statute is ambiguous with respect to the specific question posed by this appeal.

Nevertheless, we don't have to look far to resolve the ambiguity. In the same way zooming out one frame helped to identify the problem, zooming out one more solves it. Doing so reveals that subsections (b)(1) and (b)(2) are not free-floating provisions; rather, they both fall under the same heading, "Slow moving vehicle to drive off roadway." 75 Pa.C.S. §3364(b). Importantly, subsection (b)(2)'s placement alongside (b)(1) under this heading was an intentional legislative choice. In 2012, the General Assembly passed, and Governor Corbett signed, Act 3, which made changes to the Vehicle Code, including several related to pedalcycles. *See* Act of Feb. 2, 2012, P.L. 27, No. 3, §4. Most relevant here was the addition of subsection (b)(2) to Section 3364. Prior to Act 3, there was no "(b)(1)" and "(b)(2)." Rather, the "slow speed impeding traffic (failure to drive off roadway)" provision (current subsection (b)(1)) comprised the entirety of what was then labeled subsection "(b)" and which was directly attached to the heading, "Slow moving vehicle to drive off roadway." Act 3 added the "slow speed impeding traffic (pedalcycle)" provision (current subsection (b)(2)) and placed it under the same "Slow moving vehicle to drive off roadway" heading as newly relabeled subsection (b)(1). These changes are reflected as follows, with deletions shown by strikethrough and additions in bold:

**(b) Slow moving vehicle to drive off roadway.--**

> ~~(b) Slow moving vehicle to drive off roadway.--~~**(1)** Except when reduced speed is necessary for safe operation or in compliance with law, whenever any person drives a vehicle upon a roadway having width for not more than one lane of traffic in each direction at less than the maximum posted speed and at such a slow speed as to impede the normal and reasonable movement of traffic, the driver

shall, at the first opportunity when and where it is reasonable and safe to do so and after giving appropriate signal, drive completely off the roadway and onto the berm or shoulder of the highway. The driver may return to the roadway after giving appropriate signal only when the movement can be made in safety and so as not to impede the normal and reasonable movement of traffic.

**(2) A pedalcycle may be operated at a safe and reasonable speed appropriate for the pedalcycle. A pedalcycle operator shall use reasonable efforts so as not to impede the normal and reasonable movement of traffic.**

Act of Feb. 2, 2012, P.L. 27, No. 3, §4.

In our view, this legislative decision clearly evinces the General Assembly's intent as it relates to the narrow question presented. In construing an ambiguous statute, the Statutory Construction Act instructs that titles, preambles, and "headings prefixed to titles, parts, articles, chapters, sections and other divisions of [the] statute shall not be considered to control but may be used to aid in the construction thereof." 1 Pa.C.S. §1924. We find this tool of statutory construction to be particularly apt in this situation, where subsection (b)(2) was added after the statute's other provisions. To reiterate, prior to Act 3, Section 3364 contained three standalone provisions: subsection (a), under the heading "Impeding movement of traffic prohibited"; subsection (b), under the heading "Slow moving vehicle to drive off roadway"; and subsection (c), under the heading "Establishment of minimum speed limits." Yet, in adding its new pedalcycle-specific provision through Act 3, the General Assembly did not simply tack it on to the end as a new standalone subsection (d) under a new heading. Instead, it went out of its way to alter subsection (b) to make room, so the existing provision and the new pedalcycle-specific provision could share the heading, "Slow moving vehicle to drive off roadway." That is the last place the General Assembly would have situated the new provision if its intent was to foreclose any interpretation of "reasonable efforts" that requires pedalcyclists to leave the roadway.

To be sure, as appellant and the dissent emphasize, the statute does not expressly mandate pedalcyclists to exit the roadway. But this makes perfect sense: given the typically smaller size of pedalcycles relative to other vehicles, it may be possible to safely pass a pedalcyclist that remains on the highway but simply moves to the far-right side of the lane. The same is not typically true of other vehicles that merely move to the side. The statute appropriately recognizes this distinction by imposing distinct duties, specifically requiring vehicles to exit the roadway but more broadly requiring pedalcycle operators to use "reasonable efforts" consistent with the circumstances. In this way, the General Assembly plainly sought to create additional means for pedalcyclists to alleviate traffic buildup, not to eliminate any. We therefore reject appellant's claim, embraced by the dissent,[15] that Section 3364 never requires pedalcyclists to leave the roadway.[16]

---

[15] The dissent says we "improperly add[ ] language to the statute" to "reach the conclusion that such reasonable efforts may sometimes include a duty to leave the roadway[.]" Dissenting Opinion at 4. In the dissent's view, "safety is the focus" of Section 3364(b)(2), "not the normal and reasonable movement of traffic[,]" and "other measures, such as moving to the [far-]right[ ]side of the lane, are all the statute requires of pedalcyclists." *Id.* at 4-5 (internal quotations and citation omitted). But of course, the plain language of the statute says nothing of "moving to the far-right side of the lane" either, so it's curious the dissent has no problem with that interpretation. Even more curious is the dissent's vague reference to "other measures." What other measures are there for a pedalcycle operator to take besides moving to the far-right side of the lane or pulling off entirely? And if, as it seems, there are none, then the dissent's interpretation must fail. The plural phrase we are interpreting is "reasonable efforts." If, as the dissent suggests, there is but a singular "reasonable effort" required of pedalcyclists under the statute — to pull over to the far-right side of the lane when traffic approaches — then surely the General Assembly would have simply said that, rather than impose a more flexible reasonableness standard (and then situate it under a heading implicating an obvious and reasonable alternate effort that could be taken by the pedalcyclist, *i.e.*, pulling off the roadway).

[16] Appellant would have us zoom out further still to consider other provisions of the Vehicle Code, the historical and legislative record, and purported administrative guidance. Since the ambiguity is resolved within the context of Section 3364 itself, we have no need to look elsewhere to glean legislative intent. We note, however, that none of the extrinsic aids upon which appellant relies conflict with our interpretation. For example, it is perfectly consistent and reasonable that the General Assembly granted pedalcyclists the right to "take the lane" on a one-lane roadway, *see* 75 Pa.C.S. §3301(c)(2)(ii), while also requiring
(continued…)

For similar reasons, we reject the equally firm but opposite position staked out by the lower courts and, for the most part, adopted by the Commonwealth. The trial court expressed its belief that appellant "should have moved to the berm area to the right of the white fog line when motor vehicles were behind him." Trial Court Op., 8/25/22, at 3. Likewise, the Superior Court concluded Section 3364(b)(2) imposed an absolute duty on appellant to "us[e] the wide berm next to him" to alleviate the traffic buildup, even though there were obstructions in that area. *Linton*, 303 A.3d at 767. The Commonwealth, for its part, broadly argues that "[i]f a pedalcycle is traveling at such a slow speed that it is impeding traffic, the only practical action for the pedalcycle would be to move off the roadway until traffic subsides to a degree where the pedalcycle can resume operation at a 'reasonable speed appropriate for the pedalcycle' without constraining the speed of other vehicles on the roadway." Commonwealth's Brief at 5-6; *but see id.* at 25 (suggesting "the necessity for a pedalcycle to ride on either the road or the shoulder would depend upon what is reasonable under the circumstances").

These positions all assume the statute imposes on pedalcycle operators an absolute duty to vacate the roadway whenever a faster moving vehicle approaches. We do not agree. If that was the result intended by the General Assembly, it could have more easily achieved it by simply omitting the duty portion of subsection (b)(2), since the pre-

---

them to temporarily vacate the roadway under certain circumstances to avoid impeding the normal and reasonable movement of traffic. Indeed, notwithstanding the special rights and duties that apply when passing pedalcycles, *see* 75 Pa.C.S. §3303(a)(3) (motor vehicle driver has duty to pass pedalcycle on the left within not less than four feet at a careful and prudent reduced speed), and 75 Pa.C.S. §3307(b.1) (granting drivers right to pass pedalcycles in no-passing zones), it is not hard to imagine a situation where the flow of oncoming traffic is so persistent that it is impossible for faster moving traffic to safely pass a pedalcycle within a reasonable period. Nothing in Section 3364, the Code, or any of the other sources forwarded by appellant remotely suggests the General Assembly intended to allow pedalcyclists — and only pedalcyclists — to indefinitely hold up all other traffic in this manner, nor would such an interpretation place pedalcyclists and motorists "on an equal footing[,]" as the dissent claims. Dissenting Opinion at 5.

existing subsection (b) already imposed a duty on all "vehicles" (which necessarily includes pedalcycles) to move off the roadway when impeding traffic. But that is not what the General Assembly did. Thus, we decline to interpret Section 3364(b)(2) as imposing on pedalcycle operators a duty to always and immediately move off the roadway for faster moving traffic, especially since doing so would render the second sentence of subsection (b)(2) redundant of (b)(1). *See* 1 Pa.C.S. §1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."); *id.* at §1922(2) ("In ascertaining the intention of the General Assembly in the enactment of a statute," it may be presumed "[t]hat the General Assembly intends the entire statute to be effective and certain.").

The Vehicle Code provides that "[e]very person riding a pedalcycle upon a roadway shall be granted all of the rights and shall be subject to all of the duties applicable to the driver of a vehicle by this title, except as to special provisions in this subchapter and except as to those provisions of this title which by their nature can have no application." 75 Pa.C.S §3501(a). Section 3364(b)(2) is a special provision. On the one hand, it grants pedalcyclists a right to operate on any highway at a safe and reasonable speed for the pedalcycle. On the other, it imposes a duty on pedalcycle operators to use reasonable efforts so as not to impede the normal and reasonable movement of traffic.[17]

---

[17] The dissent appears to conflate the Commonwealth's burden at trial, to prove beyond a reasonable doubt a pedalcyclist has violated the statute, with our interpretation of the duty imposed by Section 3364(b)(2). *See* Dissenting Opinion at 2 (emphasizing "it is the Commonwealth's burden to prove that the pedalcyclist's choice is unreasonable, rather than the cyclist's burden to establish they acted reasonably" and suggesting this highlights the "flaws" in our interpretation). The dissent also complains our interpretation supposedly "provides no safe harbor or even an easily ascertainable rule for pedalcycle operators to avoid being convicted, let alone charged with violating Section 3364(b)(2)." *Id.* at 1. Respectfully, the dissent overlooks the reality that the Vehicle Code imposes duties on all individuals in this Commonwealth who avail themselves of its provisions, and many of those duties, like the one at issue here, turn on a reasonableness standard. *See, e.g.*, 75 Pa.C.S. §3361 ("No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing, nor at a speed greater than will permit the driver to bring (continued…)

We hold this duty may, under certain circumstances, require the pedalcycle operator to leave the roadway to allow faster moving vehicles to pass. However, it does not mandate a pedalcycle must always and immediately vacate the roadway for other vehicles.

The question that remains is when does a pedalcycle operator have a duty to leave the roadway to avoid impeding the normal and reasonable movement of traffic? In some cases, the circumstances might require a pedalcyclist to temporarily but completely exit the roadway to allow traffic to pass. In others, it may not be safe or reasonable to expect a pedalcyclist to do so, or at least not right away. And in others still, a pedalcyclist may only need to move to the right side of the lane to comply with Section 3362(b)(2). Whether a pedalcycle operator violates his or her duty to exert "reasonable efforts so as not to impede the normal and reasonable movement of traffic" poses a circumstance-dependent inquiry "best entrusted to trial courts and juries, which, as factfinders, are uniquely positioned to make such contextualized factual determinations." *Crosby*, 329 A.3d at 1150. In making this determination, the factfinder should consider all relevant factors, including but not limited to: the type of road and number of lanes in each direction; any posted speed minimums or maximums; any posted signage concerning use of the berm or shoulder; the location of the pedalcycle on the roadway; the physical conditions of the roadway; the physical conditions of the berm or shoulder, including whether there are any obstructions thereon; the weather; the time of day; the approximate number of vehicles that have been impeded by the pedalcycle; the average speed of the pedalcycle and the traffic in both directions; the frequency of oncoming traffic; the number of vehicles able to

---

his vehicle to a stop within the assured clear distance ahead."). There is nothing "absurd" about holding pedalcyclists to a requirement of reasonable conduct under the circumstances, a standard recurring in the Vehicle Code and well known to the law generally. Dissenting Opinion at 2. As a matter of statutory construction, we are not at liberty to disregard the language chosen by the General Assembly, even if it "provides no safe harbor or even an easily ascertainable rule[.]" *Id.* at 1.

safely pass the pedalcycle; and the average length of time a vehicle is behind the pedalcycle before it is able to safely pass.

It remains to be decided whether the evidence here was sufficient to prove appellant failed to "use reasonable efforts so as not to impede the normal and reasonable movement of traffic" by remaining on the roadway rather than exiting onto the berm to allow traffic to pass. That task, however, is for the Superior Court in the first instance. The narrow question we agreed to resolve "does not involve an assessment of the sufficiency of the evidence . . . but, rather, [presents] a pure question of law" involving the interpretation of Section 3364(b)(2). *In re Adoption of M.R.D.*, 145 A.3d 1117, 1126 (Pa. 2016). Having now supplied the proper construction of the statute, "we reverse the order of the Superior Court and remand . . . for it to reconsider the sufficiency of the evidence claim utilizing the proper legal standard." *Commonwealth v. Sanford*, 863 A.2d 428, 432 (Pa. 2004); *see Commonwealth v. Clay*, 64 A.3d 1049, 1057 (Pa. 2013) ("When a reviewing court applies the incorrect legal standard, our [C]ourt generally will remand the matter with appropriate directions.").[18]

Jurisdiction relinquished.

Chief Justice Todd and Justices Donohue, Mundy and Brobson join the opinion.

Justice McCaffery files a dissenting opinion in which Justice Wecht joins.

---

[18] In addition to misunderstanding the duty Section 3364(b)(2) imposes on pedalcyclists, the Superior Court applied the incorrect legal standard by omitting relevant evidence from its sufficiency analysis. *See supra* note 13. We respectfully remind the court on remand that "[t]he question of sufficiency is not assessed upon a diminished record." *Sanford*, 863 A.2d 432, *quoting Commonwealth v. Smith*, 568 A.2d 600, 603 (Pa. 1989).